and West Suburban Bank Corp. On behalf of the F1, Mr. Charles Boutwell. On behalf of the athlete, Mr. Michael Reeses, who represents Suburban Bank Corp. Then on behalf of the I'm sorry, Mr. Boutwell? Yes. Mr. Clifford F. W. Boutwell. Before we get started, obviously you note the empty chair. Justice Zinoff is part of this panel. She had a family emergency and was unable to be here with us this morning. But as you all know, your arguments are taped and she will have access to that tape by tomorrow morning and will participate in our deliberations. So, are you both ready to proceed? You may proceed when you're ready then. May I ask, we have 15 minutes and would I have time to respond? Yes, you do. The director in the decision found that both Sustatia and Child TH were victims of domestic violence under the act. But relief was denied to Sustatia because she failed to provide any corroborating evidence of her need for vessel leave. The decision did not address whether Lhabak letter 3 was corroborating evidence. Yet page 15 of the decision presumes that it was corroborating evidence, kind of, supposedly, is what it says. It clearly is corroborating evidence. The problem is... Who decides what is corroborating evidence? No, who decides under the statute what is corroborating evidence? Under the statute, there's no other decision under VESA. So, I would think corroborating evidence is evidence under the Illinois Rules of Evidence. I just presume that. So, this letter was part of the res geste, almost. I mean, it was a meeting with Lhabak at 615 on May 8th, following the court hearing. And she discusses with Robert Lhabak what happened at the courthouse that day. And at this time, there was no reason for her to even suspect that this would be an issue brought before you today. She's not a lawyer. She discussed what she did at the courthouse with Robert Lhabak. What did she do at the courthouse? She went to the courthouse. She talked with Mark Fisher, the state's attorney. She received legal advice from him. She said she wanted to drop the case. She had agreed with Henderson, who was her estranged... My question is, exactly what did she do at the courthouse on May 8th? She went to the courthouse. She talked with Mark Fisher, the state's attorney. She told him that she wanted to drop the case because of an agreement with Henderson. There was a custody battle. He dropped the custody battle if she would drop the battery case against Henderson. She wanted to keep her part of the bargain. Fisher told her she could not drop the case because it was the people. The state could only drop the case. With this legal advice, she then talked with Henderson. He told her if she didn't show up, they wouldn't have a witness and they would drop the battery case. She didn't show up. She waited outside at 130. When it was called, she was just outside the door. The case was dropped, which is what she wanted. Did she have a duty to cooperate with the state in the prosecution of the defendant? She was subpoenaed and I presume there was a duty... When I say cooperate, I mean cooperate as the witness. I presume subpoenaed witnesses should appear, but she did not. She wasn't a lawyer. Henderson told her she didn't have to appear because he'd had two other cases like this. Each time he convinced the... Would that act only take her out of the vessel of protection? No, because she received legal advice from Mark Fisher. He was not her lawyer, but she received legal advice from Fisher. That would be a reason for vessel leave. She also was participating in preparing for the hearing, but she didn't want to drop it and the only way she could drop it was... How did she participate in the court proceedings on May 8th? That's the day in question. She did not answer the call. She was outside... So your position is that she participated under VESA by going to court and saying, I'm not going to testify. That's right. Also that she received legal advice. Legal advice... Meaning you can't drop the charges. Is that the legal advice that you're pointing to? Yes. She wanted to drop the charges. She didn't know anything. Oh, I get that. She didn't know anything. She wanted to drop the charges and he told her she could not drop the charges.  That's her act of participation in a criminal prosecution? Well, that's what's happened, yes. And you think that's enough? Your position is that that's enough under the statute? One of the positions is that that would be participation. The other position is that it would be the receipt of legal advice, which is a reason for vessel leave. It doesn't have to be her lawyer who gives the advice. And so this would be, she has no money for lawyers, and this would be a reason for vessel leave. She was entitled to vessel leave because she received that advice. And so she didn't appear. And then she talked with Robert Labak about being at the courthouse that evening. So she was there. Did the employer dispute in any way that she actually did go or did not go to the courthouse on March 8th? I don't believe so. It was the law judge who made that decision as to her credibility. But he didn't say what he believed and what he didn't believe. He just didn't say he didn't believe her with respect to my case. Well, didn't the employer tell her that she had to have to infer or tell her directly that she had to have something from the court system that she was at the court that day? After the fact, I contend, we contend that there was an unreasonable burden that she had to have corroborating evidence, and it unduly restricted what corroborating evidence could be. It excluded Robert Labak's letter, which would support the fact that she was even at the courthouse and that she talked with Mark Fisher. Well, one of the important points that you have to answer is, when the administrative law judge makes a determination on credibility, what standard of review do we have to follow for purposes of affirming or reversing his decision? Because this case sort of boils down to his decision on credibility. Well, I think... And Bancorp relied on his decision to make a finding that she didn't come under vessel. Well, I disagree to some... One of the aspects, and it would be, the standard would be against the manifest weight of the evidence when the administrative law judge makes a fact determination. Okay, what's your position on why the judge's decision was against the manifest weight of the evidence? Because the reasons given by the administrative law judge were, in essence, specious. He gives three reasons. One reason is that she said she had bruises on her arm, and then a medical report doesn't reflect that she has bruises. The bottom line is that the administrative law judge believed the child when he saw Henderson strangling Sustained. And she had pictures taken by the police. That's not a reason for disbelieving somebody. It's not a reasonable reason. The other two reasons were just misstatements. She said she got the Freedom of Information Act report in 2006, and then she corrected it to 2007. There was no reason for that misstatement. It was just a misstatement. The FOIA report clearly shows February 23, 2007. Do you feel that the judge had a right to consider those factors that determine credibility? The judge can consider anything, but the reasons drawn were not logical, in my view. Typos are made all the time. The mistake of the year in the affidavit was clearly a typo. It doesn't mean she was lying. She told the truth to Elizabeth Condon. When Condon asked Wasilla Bach in court that day, that's the first time they asked you, she said no. How could she have known he was in court or not unless she was there? Then the ALJ disregarded letter three. As a matter of law, we get to the de novo standard of review. There are separate aspects here. There would be a de novo standard of review as a matter of law where the facts are undisputed. When did letter three have to be presented to the employer? Because it was never directly presented to the employer. The problem is the employer told her that LeBach could not corroborate, and this was the unreasonable burden that they imposed on Sestatum. That's the whole point. That's why we're here. They told her LeBach could not corroborate her presence. His letter could not corroborate because he was not there. But corroborating evidence goes far beyond direct knowledge. She discussed being there with Robert LeBach that day before she knew that this would be an issue. That is corroborating evidence. But when she says it, doesn't it fall into the realm of credibility? Whatever she says, somebody has to believe her or not believe her. And if the administrative law judge did not believe her, that would be one of the elements of credibility. But had he not disregarded LeBach's letter three, he could have believed Robert LeBach. But wouldn't the doctor just be reiterating what your client told him? Yeah, but she told him that day before she knew it would be an issue. It's still hearsay, whether she told him on the 8th of May, the 25th of May, June 15th. It's still hearsay, correct? Robert LeBach testified at the hearing. He presented this letter, and he said this is what happened. He did the letter from his medical notes. So it wasn't really hearsay. LeBach was a witness at the hearing, administrative hearing. But what he's testifying to was what your client told him. He had no independent corroboration of what she was telling him. Is that correct? Oh, that's correct, yes. What about the second letter? Why does that not be the equivalent of corroboration? LeBach letter two referred to it. Letter one, two, and three, one referred to treatment of the child. The decision did say LeBach letter one was corroboration, and that the respondent improperly rejected it. LeBach letter two, I believe, would have been corroboration as well, but the respondent rejected it. And so, let's see. And letter two indicated that she should cooperate with the prosecutor so that she could get some relief from the psychological consequences of the family violence aftermath. Yeah, yeah. Why wouldn't that be some type of corroborating evidence? In the backhand, it sort of would be corroborating evidence. They just, as an unreasonable burden, which is why I think it's a matter of the law. The disregard of this letter is a reason either to give a judgment in favor of sys data as a matter of law, because there are, to the extent of undisputed facts, then under the Richard Tyre case, the standard of review is de novo. But if you get into disputed facts, then the disputed facts are either, you would bring it under to clearly erroneous or manifest against the manifest way to the evidence. So, on the issue of credibility, yes, we get into against the manifest. Do you believe that her credibility was not an issue with respect to LeBach's second letter? Absolutely, yeah. And LeBach testified, you know, that he sent the letter. He had the meeting with it. He requested it. What's the significance of the bank first initially approving and recognizing that it fell under BESPA and then changing their mind? Well, one reason is the bank says we're going to accept it as corroboration. The police provides a sworn affidavit, and she does that. So it kind of traps her. It gives unreasonable standards for what would be corroborated letter evidence. It accepts the letter, too. And yet on its face, the letter is written before the hearing. So the bank must know that LeBach was not there. So it was unreasonable. She still would have to have some corroborating evidence. And you're relying primarily on what for that corroborating evidence? Well, LeBach letter three would be corroborating evidence. Also, I disagree that if you have corroborating evidence, you have to provide it. But the statute does not require you to provide evidence you do not have. So one issue is whether LeBach letter three was corroborating evidence. I believe, frankly, it is. But the ALJ disregarded it and did not make a decision. And then the bank would have improperly interfered with the status providing the corroborating evidence, which is a violation of ESSA. The bank told her this cannot be corroborating evidence. That's why she did not give it to the bank. That's the whole key here. The bank interfered with her ability to provide the corroborating evidence three times. Two letters verbally on the third occasion. Elizabeth Condon, who made the decision to file this data, told her LeBach cannot corroborate your being there. This was wrong. It was an undue burden. It interfered with her right to elect ESSA, and that's a prohibited interference. Where did the source of information contained in letter three come from? LeBach testified. Where did he get the information? From the meeting on May 8th with Sustato. They had a meeting at 615 that evening on May 8th. He took his medical notes. Where did that information have to come from? That he saw her May 8th after she, after the court hearing. He saw her May 8th. We know that. But he could see her May 8th not necessarily because of the court hearing. That information would have to come from her. Why are you here? She arranged for a meeting at 615 on May 8th. Dr. LeBach, or Robert LeBach, not a doctor. He took notes at the meeting. He did not have an independent recollection. He took his medical notes. He wrote the letter from his medical notes, the letter of June 27th. It came from his medical notes based on his meeting with Sustato that day. But the information in the medical notes had to come from the patient. Oh, yes. It was the conversation between the patient and Robert LeBach. And if the judge finds no credibility in the patient, why should he give any weight to the letter, which is based on what the patient told the doctor? Well, this, there's no reason for Sustato to be lying to Robert LeBach. She went to meet with him to discuss her trauma, her experiences with the battery, what she's going to do. She has no reason to believe that this is going to be an issue. In this case, she's not lying. She just goes to discuss what happened at the court that day. And she brings it up, and he makes notes. So she was at the courthouse. And then you have to go on to say, well, if she was at the courthouse, what if she talked to the state's attorney? And she did. Do you have any other arguments upon which we could affirm or reverse the trial court's finding, other than finding that the ruling of the judge was against the manifesto? Well, if you find, to the extent you can rule where the facts are undisputed, you could find as a matter of law that the bank's actions were prohibited interference with her right to produce LeBach letter three. Moreover, it could be sent back to the law judge to make a decision that he has to consider LeBach letter three and tell us whether he would then believe she was credible because LeBach supports his corroborating evidence that she was at the courthouse because she talked with him and he disregarded that letter. So this corroboration is absent from his decision. He didn't consider it. And so when a trial of fact ignores properly admitted evidence, that's a grounds for reversal and remand. What happens when the bank initially acknowledges that she was at the courthouse? The bank acknowledges that there was an act of family violence, so-called, and that Fessel would apply. And it made that finding and initially recognized that she was entitled to a day off. Then they changed her mind and it goes to an arbitration type of hearing. And then the judge in the arbitration makes a finding regarding credibility, which was apparently the opposite finding was made by the bank. How do those two things balance out with respect to an ultimate conclusion? Because the bank changed its mind based on the ruling of the arbitrator. Well, the bank changed its mind. It initially accepted LeBach letter two and then it changed its mind and took it back. There was no arbitrator that I'm aware of other than the administrative law judge. The bank changed its mind because it learned, maybe some other information, kind of indicated that since they had told her that LeBach wasn't there. The bank wanted additional corroborating evidence. I don't remember what happened. Yeah, later on it wanted, but it told her initially this is okay and go ahead and request your vessel leave. So it let her down the path. Didn't she also have to submit a sworn statement? Oh, yes. And she never did that, correct? She did submit a, now the blank affidavit form that she completed was inadequate. It only gave a couple of reasons for vessel leave. It did not give all the reasons for vessel leave. And she probably, legal advice, getting legal advice was a reason. And she obtained legal advice from Mark Fisher. And she was there at the court preparing for the hearing. Okay, counsel, you have a chance to reply. Do you wish to present an argument? Yes. Thank you. May it please the court, my name is Cliff Berlow. I'm an assistant attorney general, and I'm here on behalf of the Illinois Department of Labor and its director. I'd like to begin with Justice Bowman's observation that this whole case comes down to credibility. That is exactly what this case ultimately is all about, and that is the narrowest grounds upon which this court can resolve these issues. The central issue is whether or not Ms. Susteda met her burden to establish that she was entitled to a leave of absence under the act. It is very clear that that is an element of the cause of action, just as it is an element of an interference cause of action under the FMLA. Ms. Susteda's failure to meet that element occurred on two different levels. First was her failure to establish that she used her absence on May 8th for a permissible purpose under the act. And second was her failure to establish that she met the certification requirement provided for under the act. With respect to the first, this court can affirm, based on its finding, that she failed on either of those grounds. The first failure, the failure to establish that she used her May 8th absence for a permissible purpose, as Justice Bowman noted, came down entirely to a credibility determination, a finding that it simply was not believable, or at least the ALJ and the Department ultimately, determined that she did not provide any credible evidence to establish that she actually did the activities that Mr. Bootwell described. Let's stop there. I have a question right there. Generally, in most cases, you'll find that when a witness is more detailed in developing a story or an issue, the court's given more credibility. Somehow, this law judge turned that on its head, and because she was more credible, vis-a-vis some other contacts that were had that were less, were more general and less specific, he seems to take the position that the important factor, or one of the heavy important factors in finding those credibility, was she was so specific about her contacts in the court system that he couldn't believe it. Now, when I first hear that, and based on my experience, it usually works the other way around. Most of the time, when the party's vague and indefinite, and there's less credibility given, the more definite the party's testimony is, the more the fact finder gives credibility. And what are the options of the court when facing that particular issue? Well, I think that what the… Because as a factor, we could use our reasonable experiences in life as a fact finder, the same as a juror. Certainly, Justice Bowman. I think what the ALJ was observing is a general inconsistency in her demeanor, and it is difficult to look at a black and white page at this stage and identify all of the different elements that go into a credibility finding for someone that has observed a witness. It is for this reason that both this court and the Illinois Supreme Court, and, candidly, every court in our legal system, it's very clear that extreme deference is owed to credibility determinations among fact finders who observe a witness. And, in fact, with respect to your earlier question regarding the standard of review, it is a manifest way to the evidence standard. But as the Illinois Supreme Court explained in Abramson and put a gloss on that, that standard in the context of credibility is merely established when there is any competent evidence to support the credibility of finding. And that clearly exists here. When you observe an inconsistency in a demeanor, when you observe that there is only specificity on the most critical legal point, it is reasonable to infer that someone with a bad memory would not suddenly have a crystal clear memory with respect to only that issue which ultimately will determine her rights under a statute. I agree that often the sort of inference that you're talking about is a reasonable one, but that simply does not establish that the converse inference is completely irrational or arbitrary. And that's essentially the standard that Miss Husteda has to meet here. Miss Husteda really hasn't done that. And it seems reasonable to say that an ALJ that observed a witness, that heard her testimony, is entitled to say ultimately, I just didn't believe her. And that's what we have here. Absent any other testimony or any other evidence confirming her actions on May the 8th, it's simply impossible to know whether she was using her time off for a protected purpose. It is an equally plausible inference from these facts. The only evidence we even have of the court hearing taking place is a note from the court dismissing the criminal case against Mr. Henderson because of her failure to appear. It would be equally plausible to infer that Miss Husteda called the state's attorney in the morning to notify him she wouldn't be there. It would be equally plausible to infer that she did nothing. Do you agree that there is no dispute of fact that there was an existing criminal case? Yes, I agree that that's clear from the record and that's consistent with what the judge found. Was that she was to be a witness in that criminal case? Yes, I think that's a reasonable inference. Do you feel that the act would apply if she did call or just didn't show up, that there would be activity relating to a criminal case, and by not showing up the activity would be the cause of inactivity? I think that the answer to your question, Justice Bowman, would turn on the very specific facts that went into the interaction between the state's attorney and the potential witness. With respect to the specific facts of this case, the department does not have a position as to whether or not that would qualify under the act. And the reason is that the department is ultimately entrusted with enforcing and administering the act. And it's a role in which it's typically given deference by the court as it's a statute that administers. So from the department's point of view, to answer whether Miss Husteda's specific facts, which we consider to be essentially hypothetical, that would amount to an advisory opinion that we're simply not able to provide. It would be a question of law if the victim told the state's attorney, I will not testify, I'm going home. Whether or not that would come under visa would be a question of law, not a question of fact. Yes, yes. And specifically with regard, if I misspoke, I apologize, Justice Bowman. Specifically with department and agency findings on questions of law, that this court gives deference. And it's because of that unique role that the department is simply unable to offer what we consider to be an advisory opinion in this circumstance. Are you taking the position that if she did show that she did appear and did exactly what she said she did, that when her name was called, she didn't appear, that that would come under a visa? We're not taking that position, but we're not arguing either that it wouldn't be sufficient. We're simply agnostic as to that. Counsel, what is your position then? Well, our position is that the events that, as she described on May 8th, simply never took place, or at least there's no evidence to confirm that they took place. So we have no way of knowing whether or not Ms. Susteda was taking a protective action on May 8th, and therefore she does not qualify for leave under the Act. Because there's no corroboration? Well, because there's no evidence on the record one way or the other to confirm what she did on that day. For all we know. Well, there's her testimony. Well, but that evidence was deemed not credible, and evidence that is considered not credible is not considered admissible evidence. So we're left, in essence, with a black shirt. Just a little more evidence. When she requested approximately 10 days before the 8th, she made an oral request to the employer for a day off because she had to attend a court hearing regarding the family violence. So there is something in the record. There is certainly some evidence in the record that there was a criminal proceeding, that she did intend to go. What we don't know is whether she actually went. I think I can say with profound confidence that the Department's view is, had she stayed home and done nothing at all, that she would not be attending, participating in, or preparing for a hearing, which is the plain text of the statute. Does she have a right to do that under the broad language of the act and the intent of the act? To stay home and do nothing. No. Our position is that if a claimant wants to take a leave of absence pursuant to VESA, under the rubric of seeking legal advice and participating, preparing for, or attending a legal proceeding, that individual has an obligation to go. That is, that I think is. Just to go? Well, to participate, prepare for, or attend. What does that mean? Well, I think with respect to attend the hearing, I think it certainly means being in the courtroom. I think that that's. Does it matter if she sits mute in a courtroom and doesn't answer, or if she sits in a hallway and doesn't answer? Is that participation or not? Well, she's argued in her brief, and I was candidly a little surprised to hear the reference to participation. She argued in her brief that it was a form of preparation for court, which is the question that we're agnostic with. But we firmly agree that she was not participating in the hearing because she didn't appear as a witness in the hearing, and she was not there as an interested party. So you're trying to tell me that you are here to argue on behalf of the department but not take a position as to whether or not if what she said happened happened, that constitutes preparation for a criminal proceeding? Yes, ma'am. That's absolutely our view because there's no evidence that that's what actually happened. I didn't ask you that. I asked you if what she says happened in fact happened, do you have a position as to whether or not that constitutes preparation? No, Justice. And because you are in the middle. With all due respect, then, how do you represent the department and not be able to take a position as to what the facts constitute? Well, because that's the view of the department. The view of the department here is that it presents a hypothetical and not a question that is actually presented by this case. In order to reach that conclusion, you have to overturn the credibility finding. There is no way to reach that question unless the court determines that there is no competent evidence to support it. So for the sake of argument, we're going to do that. Then what? I think in that circumstance, the department is prepared to load the court's judgment, whatever that may be, on that question. Doesn't the facts of this case, if you read it in, say, an opinion, doesn't that discourage employees from relying on VISPA? No, I don't believe that the department's position. When somebody gets fired over a one-day issue? Well, I don't think that the department's position would have any sort of chilling effect on a claimant seeking VESA. The department's position here, as I think Justice Jordan has made very clear, is very narrow. There really are only two very specific positions that it's taking here that would have any effect on a claimant. The first is that an individual must use VESA leave for an approved and proper purpose under the Act, and they must actually use that leave as they have informed their employer that they will. That seems intuitive, and I don't see that as being particularly having any sort of chilling effect on a claimant. Bottom line, an employee took one day off and got fired. That's the bottom line. Because that's all that happened. Other than the fact that they took the position, they relied on the finding of the arbitrator. She didn't come under VESPA, and they also made a finding that apparently her conduct was defiant and irascible. Those aren't the words that were used, but those are the words that come to my head. And they fired her. Now, if she had at-will employment, they could fire her for any reason, but they fired her because she took a day off without fully complying with their requirements and the law. Well, they fired her for not complying with the law in both respect to the attendance at court, which we just simply don't know anything about, and with respect to the certification requirement. I hear my time. Should I continue? Yes. All right. As far as whether or not, I mean, I understand that the bottom line end result here leaves you concerned, Justice Bowman, and I understand that, and that's in part why we recognize this is a difficult case. Our view is that Ms. Usteda had really two very clear and simple obligations, and the first was to do as she said she was going to, which is attend court and participate in a criminal prosecution, and second, to provide some sort of corroborating documentation to her employer. Now, we agree that the bank, and this is clear from the ALJ's opinion, that Bancorp was overly aggressive in what it was seeking as a form of certification. The Act allows for legal documents, documents from certain victims' rights and lawyers and those sorts of people and their specimens, or any other corroborating evidence. Other corroborating evidence could well include, it appears anyway, I should say, that Bancorp was seeking only direct evidence, and it seems to interpret direct evidence to mean only eyewitness evidence. And we believe that that goes too far, and that was the basis of our finding, that Bancorp did act improperly here. But Ms. Usteda also has an obligation to demonstrate that she's entitled to leave under the Act, and she hasn't met that standard here. So I understand, to come full circle here, I understand the concern here about the ultimate outcome, but the Department's finding in its position here is that Ms. Usteda simply didn't meet the requirements of the Act, and that is the consequence of her failure to act in a prudent and provident fashion. If there are no further questions from the Court, I'm happy to rest on my brief. So what is the definition of corroboration under the statute? Well, I think that corroborating evidence, this is one of the areas where I think VESA will ultimately, as we go forward and have more and have published decisions on this statute, I think this is an area where VESA is going to depart significantly from FMLA, because certification under the Federal Family and Medical Leave Act is much more straightforward. The Department of Health and Human Services has provided a simple form that employers simply give to their employees, that a doctor then signs and submits back to the employer after the Act is over. I think as we go forward with corroborating evidence, and I don't mean to be evasive, but I think that there are any number of documents that could potentially constitute corroborating evidence. We do believe that it comes as a broader array of documents than mere eyewitness testimony. Ms. Usteda was not obligated to have a minder with her when she went to court. So, for example, she had had a friend drive her to the court appearance, and that friend said, call me when you're ready to go. And Ms. Usteda were to have participated in the criminal proceeding, served as a witness, and then called her friend, and her friend picked her up. And Ms. Usteda describes in vivid detail exactly what went on in the courtroom, exactly the sorts of questions Mr. Henderson's lawyer asked her. We would think that would likely be adequate corroborating evidence. It's circumstantial, but we would think that that would be sufficient. So we would go farther than what Bancorp seemed to suggest here, which is that only a person that was in essence a witness to every action she took that's relevant to this question could possibly provide corroborating evidence of her attendance. When you say certification, could you have an oral certification? I mean, what does the statute mean by certification? Usually certification is a statement that, you know, legally we're all used to, I certify that your thought statement is true and correct to the best of my knowledge. However, is there an oral certification you could do? Well, I believe that... I would go in the court instead of having it written and say, I certify that's true. You know, I say that to the best of my knowledge, I orally certify it's true. Well, I think that a claimant couldn't provide a self-certification. That's what the affidavit is, and clearly the statute envisions there being two different parts. But with respect to another person providing an affidavit or some sort of oral certification to an employer, I think that would be adequate. Doesn't the act, as I read the act, the victim is the one that must certify, and two, the victim is the one that must provide corroborating evidence? Yes, Your Honor. The victim is the one that does the certification, but it doesn't tell you how the victim certifies. There's no doubt that the victim made an oral statement ten days before the hearing, and there's no doubt that after, I think three days before the hearing, the employer indicated that they acknowledged that it didn't come under the vestibule. I think it was three days, that's my memory, three days before. But there was an acknowledgment by what seemed to be a supervisor of the bank that they acknowledged that the situation came under vestibule, and that she met the requirements to be eligible for a day off. Then they changed their mind, and then all of a sudden we're on another different page, and we're walking down a different road, and it gets into arbitration, and the way I read it, the person in charge of the decision of whether she gets a day off or doesn't get a day off pretty much relied on the findings of the law judge in stating that she didn't come under the vestibule. Well, I think perhaps what would be helpful is to clarify something that Counselor Frumas-Zustada mentioned earlier. The error that was found with respect to the Bachletter I was that it was relevant to determine whether she was a victim for purpose of the act, which goes to a different element. And I think the same would hold true of the Bachletter II. I think it would be relevant to establish whether Ms. Zustada and her son were victims for purpose of the act. But they are prospective in nature, and the Department's view is that a document saying, I will have to go to court on Thursday, would not be sufficient to corroborate attendance at court. So the error from Bancorp was rejecting them as evidence that she was, in fact, a victim, but their rejection was not an error from a corroborating evidence standpoint, which falls within the entitlement element of the statute. So that would be the distinction that I would draw there. I think that answers your question, at least to the best I can off the top of my head. You said before I asked you about corroboration that you gave me an example of circumstantial evidence. Yes, Your Honor. But your circumstantial evidence, the example you gave, was a third party who would say, look, I picked her up, I dropped her off in front of the courthouse, I came back an hour later. That would be corroboration. Plus the victim saying, yeah, and after I got dropped off, I went up to X courtroom, I sat there, testified, now I'm done. Here, do you believe there is corroboration or not? No, we don't believe that there was corroborating evidence because the only document that looks like, I think you're getting at LeBock Letter 3, Justice Jorgenson. I'm trying to get you to answer some questions about the statute. Yes, yes, Your Honor, and I'm doing my best. LeBock Letter 3 was not submitted to the employer, so it is not certification. Right, I know that. So that alone would remove it from qualifying as a form of certification. It can be a corroborating document from the employer's perspective if it never had it. The first time Bancorp received the document was an attachment to a lawsuit. So that simply removes it from the corroborating evidence requirement. It's being relied on by Ms. Eustates. I understand her position, not as evidence that she satisfied the corroborating document requirement, but as evidence that she went to court. But as you pointed out during argument, it relies on testimony. It relies on the same testimony that the ALJ concluded was not credible, and that's a finding that is owned, obviously, extreme deference by this court on appeal. Do we know why she was fired? Is it in this record? Well, the... I mean, all of her employment records? From the record, it appears that she was dismissed because she failed to explain her absence on May 8th. And I think Bancorp also referenced a growing number of other absences from work. But it's clear that it seems that the trigger for her dismissal, unless there is something in the record we don't know about the relationship between the employer and the employee. What's in the record? Is there anything in the record that would indicate this was the sole reason she was terminated? That appears to be the case, Your Honor. Thank you very much. Thank you. Counsel, do you wish to reply? Oh, I'm sorry. Go ahead. My mistake. I'm sorry. That was an auspicious way to begin an argument, but... My mistake. I apologize. That's okay. To begin with introductions, my name is Mike Resus, and along with Jeff Rich, I'm here today on behalf of the other defendant, Appelli. The finding that the plaintiff was not on bail unless a leave on May 8th was not clearly erroneous. The ALJ did not find her credible, based on the totality of her testimony and on her demeanor, as the department has already indicated. To give you a couple of examples, the plaintiff testified that she learned of the May 8th court date by a letter. She couldn't produce the letter. Yet when she first asked Lobach for a letter, she told him that the court hearing related to child custody, she said nothing about a case involving a domestic violence incident. She gave inconsistent statements about where she was and what she was doing when she sought to be excused from work on June 21, the very next month. And we learned after she was terminated during the course of these proceedings that she went tanning and went for a pedicure and a manicure on May 10 and on June 21, which were obviously an abuse of VESA. The ALJ's findings could be affirmed, as the department suggested, for reasons of credibility alone. But even accepting her testimony at face value, she did not show that she was entitled to leave, and she had the burden of proof. Under Section 20 of the Act, an employee is entitled to leave when, quote, seeking legal assistance or remedies. Those are the key words, seeking assistance, legal assistance or remedies. By her own testimony, she had no intention of seeking legal assistance or remedies because she had already agreed with her boyfriend to have the domestic battery charge dismissed. Even assuming she went to the courthouse on May 8, it was only to fulfill her part of the bargain. However, she was not preparing for court. Even assuming she spoke with the state's attorney, her conversation was limited to seeing what was needed to get the charge dismissed. Now, Plaintiff made a dispute, defining that she was not credible. But what is beyond dispute is that she deliberately absented herself from the courtroom when the case was called, leaving the state no choice but to dismiss. Plaintiff did not attend or participate in court proceedings, and far from preparing for court, she did not even cooperate in the legal process. Instead, by her deliberate absence, she made sure that process could not go forward. Plaintiff would have this court hold in a case of first impression that an employee is entitled to leave even when the trip to the courthouse is to thwart the legal process. To accept that argument would frustrate the legislature's reasons for adopting Bess in the first place. It would turn the Act on its head. I want to point out the Act states that the Act was enacted to, number one, promote the state's interest in reducing domestic or sexual violence by enabling the victim to maintain financial independence to leave abusive situations and to reduce the economic consequences of such violence to employees and employers. And two, protect the employment and civil rights of the employee or the family who are victims of domestic or sexual violence. Your whole argument is focused on if you don't appear in court and it's not a criminal case, you're not eligible for the Act. That's not true. No, no, Justice Bowman, that's not my argument. My argument is that if you are going to seek the protection of the Act, it requires that you fall within certain terms, and those terms have been part of the statute and there's also other interpretive aids. So there are examples. For example, if she had gone to court because she needed to get a court order of protection, she'd be covered. If she went to court for a preliminary hearing, I'm sure that any grateful assistant states attorney would give her a letter and we would accept that, obviously. What if she said that I want to see a doctor? Nothing to do with court. Well, that's fine. I want to see a doctor. But that's not the reason she gave. I know that. Okay. Obviously she'd be, yes, and you know what? She'd get a doctor's note. Right. Look, I mean, this is a new Act. It was enacted in 2003. Okay, we don't have to talk about that anymore. Right. I just, you know, this is more than just a court situation. Yes, I just want to make clear, though, that, you know, the department position was not to take a position. Our position is she was not going to court for legal assistance or remedies as she had represented was the reason for her excused absence. The finding of the bank that, I'm sorry, the finding that the bank did not violate VESA was also not clearly erroneous. All of Plante's arguments, to the contrary, put the cart before the horse. Logically, because Plante did not first show that she was exercising a right to take leave, the bank could not have interfered with or denied or restrained or discriminated against or in any way retaliated against the exercise of that right. We cited cases involving the Family and Medical Leave Act in our brief because we think that statute is analogous to VESA. Those cases recognize that an employer does not interfere with statutory rights if the employer has an honest suspicion that employees are not entitled to leave. In this case, we had that honest suspicion that Plante was not taking valid leave. By the time the bank withdrew approval on July 17, 2006, it knew, one, Labate had written two letters giving different reasons why Plante needed to be excused from work on May 8. Two, Plante had given contradictory statements about the need to take leave on June 21. Three, Plante had revised her own sworn statement about the reasons for taking leave without providing any corroborating evidence relating to the July, relating to the June 21 absence. Four, Labate had not been able to corroborate Plante's attendance on May 8. And five, Labate did not respond to a previous letter asking for corroboration. As we now know, he did write such a letter, but the Plante withheld it from us. Plante complains that the bank certification form left out that leave was available for purposes of preparing for or attending the hearing. But the fact that this one document did not technically list all of the reasons did not mislead Plante or prevent her from exercising rights when she was not taking leave on May 8 to seek legal assistance or remedies as the act required in the first place. Any error was harmless. Judicial review of an agency decision is limited and does not include re-evaluation of the credibility of witnesses. Plante's inability to tell the truth went to the heart of the reason for her termination in this case. That reason was she falsified employee eligibility. Mindful that it is not a right but a privilege to appear for oral argument, we are grateful to do so this morning, even at this fairly early hour. We believe that her arguments, if accepted, would promote abuse and fraud under the Act. The findings, conclusions, and recommendations of the ALJ, the Department, and the trial judge on administrative review should be affirmed. If there are no other questions, we ask you to affirm. Thank you. Thank you. You asked a question about whether the record supports the reason for termination of Elizabeth's data. I addressed that beginning on page 9 of my brief. Mary Ellen Condon issued a written document and the Administrative Law Judge issued a finding that she was terminated for failure to provide corroboration. They called it gross misconduct and insubordination. Correct, counsel. I read that. My question was, does the record show any other basis for termination, or does it leave the question open? Ms. Condon unquestionably was the decision-maker. I get that. The question is, is there anything in the record that would show this was the only issue she'd ever had with employment with the bank, so that the only reason she was terminated was this event? She so testified. Which she is that? Huh? Which she is that? Ms. Condon testified. I asked her that question, and she said the only reason she was fired was the failure to provide corroboration. And my point is, the bank gave her release information as to what was corroborating evidence, and she didn't give them the black letter 3. And because of their misconduct, which the decision found improper, she didn't give them the black letter 3, and she was fired for that reason. And so there's a direct connection between the improper advice, which the decision found the bank did, and her failure to give her the black letter 3, which I believe is corroborating evidence. And I think the state's argument supported that, because we are talking about a statement to a third party the same day, that she was there in court. She had no reason to lie at that time. She didn't know this was going to be an issue. Dr. LeBach didn't go to court with her. Absolutely. He didn't drop her off. No. All his letter says is based on what she told him. Is that correct? That's right. Okay. But that's corroboration, in my opinion. Okay. And I think corroboration is any evidence that a court would admit as circumstantial evidence to support whether a fact is true or not true according to the Illinois Rules of Evidence. This was written, the statute was written by Obama. He's a lawyer, a brilliant lawyer, and he knew what corroborating evidence was. It's not defined elsewhere, but corroborating evidence is well-defined in Illinois law. So I don't think you really go beyond that and change the definition of corroborating evidence, which is extremely well-defined. This issue isn't argued, but there's a limitation on if LeBach is apparently not a medical doctor. And there is a hearsay exception for medical doctors' written documentation, but that hearsay type exception, doctor need not come and testify. You could get a medical report and submit many times. But it sort of excludes the reason for getting to the doctor. The exclusion has to fit in some type of medical situation. A patient came in and said, I broke my arm in a fall. A doctor writes down, broke an arm in a fall. That type of thing. But it's a statement that says, I got here via a yellow cab, and I'm here for a pain in my chest, and she's suing the yellow cab company. You can't get that information in against the yellow cab company because it's got nothing to do with the medical department. Here we've got another complication because this is a social agency, not a medical agency. But anyway, I just throw that out. That wasn't really argued in the briefs. Robert LeBach's office was with the Dreyer Medical Clinic, and he was a clinical social worker with that clinic,  I think for purposes of the Act, the Act does accept hearsay type of evidence as corroborating evidence. One final point. Susteda's whole objective here was to save custody of her child. She did not want to lose custody of her child. And that's her whole objective. It's not flawed on the court like the bank argued. She wanted to save her child, and the way she absolutely could save custody of her child was to drop the proceedings she learned from my fixture. She never raised that in her hearing, did she? I'm raising it now. Okay. There were no arguments before the administrative law judge, so nothing was raised there. And so I'm making that argument now on the legal advice because it occurred to me. And once she got the advice from Mark Fisher, she acted on it. She just didn't appear because that's the only way she could assure custody of her child. And that goes right into the purposes of the Act. She has this terrible traumatic experience, and now she's losing her child, custody of her child. And that was foremost in her mind. Nothing else. I would also add that the other dates they referred to are irrelevant. The sole reason for discharging the complainant was failure to provide corroboration for the May 8th. But as far as June 21 is concerned, she's on her way to work. Henderson calls her. He says he's going to take her child from the babysitter, and she will never see him again. And she panics. She calls, does not show up to work, asks for Bessel to leave. It's denied, but it's not relevant to here. And then apparently because she was off work, she did buy some groceries at Sam's Club, and she did go tanning during the day while she was off that day. But the reason she didn't go to work was because of the call from Henderson while she was on her way. It's a relevant thing to this case. Thank you very much. Thank you. The decision will be reached in due time.